# Exhibit 3

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    CASE NO.:   2:24-cv-06340-FLA-RAO

 4
     DANIEL MEDINA, an individual,
 5
         Plaintiff,
 6
     v.
 7
     STILA Styles, LLC, a Delaware limited
 8   liability company Nicole Marr, an
     Individual; and Does 1-25, inclusive,
 9
         Defendants.
10   _____/

11

12              REMOTE VIDEO DEPOSITION OF
                       NICOLE MARR
13
                  Wednesday, July 9, 2025
14                9:34 a.m. - 1:20 p.m. PT

15

16

17

18

19

20

21

22

23

24

25              Stenographically Reported By:
                       SUSAN MULLEN
```

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1   suffered any injury or illness, that could --

2       A   No.

3       Q   Okay.  Thank you.  All right.  You're employed

4   by the defendant in this case, Stila Styles, LLC,

5   right?

6       A   Correct.

7       Q   Okay.  And you understand when I say defendant,

8   I mean that my client, Daniel Medina, has brought a

9   lawsuit against your employer Stila Styles, LLC?

10      A   Correct.

11      Q   Throughout the day, I'll just say Stila instead

12  of Stila Styles, LLC every time, okay?

13      A   Sounds good.

14      Q   All right.  And what is your current title at

15  Stila?

16      A   Vice president of field sales, education and

17  events.

18      Q   How long have you held that title?

19      A   Six years this month.

20      Q   Thank you.  So you assumed that title in

21  approximately July of 2019; is that fair?

22      A   Correct.

23      Q   When were you -- or -- let's see -- when were

24  you first hired by Stila?

25      A   July of 2019.

NICOLE MARR                                                    JOB NO. 1773642
JULY 09, 2025

```
 1       Q   And I think that was the same supervisor you
 2   mentioned only -- you only reported to for a few months
 3   after you were hired, right?
 4       A   Correct.
 5       Q   Got it.  Okay.  Did you interview with anyone
 6   else?
 7       A   With HR.
 8       Q   Do you remember who at HR by any chance?
 9       A   Brenda.
10       Q   Anyone else besides the K supervisor and Brenda?
11       A   No.  Sorry -- her name was Katie.
12       Q   All right.  Now, let's see -- oh, I think -- I
13   think your attorney's working on getting your job
14   description, so I might ask you some -- some questions.
15   I think I'll hold off on asking you what your entire
16   job entailed.  But maybe -- well, let's do it this way:
17   Would you mind, please, just describing what your role
18   involves, broadly, and maybe, if possible, I'll show
19   you a job description later and ask you some more
20   granular questions.  But just a high level, what do you
21   do at Stila?
22       A   High level, I manage the entire field team
23   domestically.  I manage education globally, and I also
24   oversee major events for the company.
25       Q   Okay.  We could talk about different periods
```

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1   during your tenure -- I mean, it strikes me that the

2   pandemic must have really -- well, we could -- I

3   imagine that Stila's operations changed significantly

4   because of the pandemic; is that fair?

5       A   Correct.

6       Q   So let's take -- let's talk about what happened

7   -- well, before the COVID pandemic began, approximately

8   how many -- how many actual Stila employees worked on

9   the field team -- the domestic field team that you

10  managed -- and just to clarify my question, I know that

11  Stila has -- uses the services of some contractors as

12  well as -- and also has some in-house employees, my

13  question is just -- just limited to those in-house

14  employees, how many of those were there on the sales

15  team you managed -- the field team you managed?

16      A   Correct.  So you're talking about account

17  executives, account coordinators that actually receive

18  Stila paychecks?

19      Q   Yeah.  That's right.

20      A   At the time of COVID, we had 24 plus four

21  regionals, so 28.

22      Q   So when you say four regionals, what do you mean

23  by that?

24      A   So we have regionals across the US that help to

25  manage the account executives, so we had an East Coast,

1    West Coast, Central Coast, and Northeast.

2    Q    And then let's talk about in addition to those,

3    sort of, account executives, coordinators and the

4    regionals; aside from those, how many contractors did

5    Stila utilize in its domestic field team before the

6    pandemic?

7    A    I can't speculate to an exact number because it

8    fluctuates based on the needs of the company.

9    Q    Could you give me a range, approximate range?

10    A    Back before COVID, it was around 50- 60.

11    Q    Prior to COVID, was Southern California the

12    biggest market where Stila operated?

13    A    No.

14    Q    What was the biggest market domestically in

15    which Stila operated prior to COVID?

16    A    It -- without numbers in front of me and store

17    numbers, I can't give you an exact, but Texas and

18    Florida are pretty large.

19    Q    Would you say Texas and Florida rival

20    California?

21    A    They do.

22    Q    So fair to say Texas, Florida and California

23    would be the three biggest markets domestically in

24    which Stila operated prior to the pandemic?

25    A    Yes.  But it also is fair to say that California

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    is not one market.

2        Q    Got it.  How is California divided then?

3        A    Prior to COVID, we had three account executives

4    in Northern California, Southern California, and in San

5    Diego.

6        Q    And prior to COVID would you say that Southern

7    California was bigger or smaller than Northern

8    California?

9        A    I would have to look at numbers.

10       Q    Okay.  What about compared to Texas, was

11   Southern California bigger than Texas?

12       A    No.  Texas had more doors.

13       Q    What about Florida?

14       A    Florida had more doors.

15       Q    Okay.  But San Diego, I'm guessing, is probably

16   smaller than Southern California, otherwise, right?

17       A    Correct.  San Diego was smaller.  Prior to COVID

18   we were also in Sephora locations, and that drove the

19   sales and the door number count higher in Southern

20   California and San Diego.  After COVID, we were no

21   longer in Sephoras.

22       Q    Got it.  Okay.  Now, when you say you managed

23   the entire field team domestically, I guess, who --

24   well, let me ask -- let me try to break it up a little

25   bit.  Is it the regional -- when you say the regionals,

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1  do you mean -- are they called regional account

2  executives, or regional managers?

3      A   Regional sales directors.

4      Q   So is it only the regional sales director who

5  reported to you prior to COVID, or did some of those

6  account executives or coordinators also report directly

7  to you?

8      A   They all reported to me; however, I could not

9  possibly manage all 24 of them, so we had the regionals

10  to help.  So they would -- all 28 of them would come to

11  calls with me on Tuesdays, and then the regionals would

12  then have subcalls and manage the day to day with the

13  account executives.

14      Q   Makes sense.  So is -- would it be fair to say

15  that prior to COVID -- so, wait -- yeah.  Would it be

16  fair to say that prior to COVID, the 24 or so account

17  executives and coordinators you mentioned, were each

18  also assigned to one of the four regional sales

19  directors?

20      A   Correct.

21      Q   Today, how many -- no, no, there's a more

22  specific question I can ask you.

23          Let's take it chronologically, now once the

24  COVID pandemic broke out, how did that affect the

25  makeup or size of this domestic field team?

1      A    There may have been times that we had him go

2    into an industry store in Los Angeles.

3      Q    But, otherwise, just Ulta?

4      A    Correct.  That was his -- his main priority.

5      Q    Okay.  And so to the best of your knowledge,

6    Daniel never worked for Stila in any Sephora Stores?

7      A    Correct.

8      Q    And Daniel reported to the regional director, to

9    whom Daniel reported was Charles Miller, right?

10      A    Correct.

11      Q    He reported to Charles throughout his employment

12    there?

13      A    Correct.

14      Q    Then it would have been normal -- normal

15    procedure would have been for Charles to also be in

16    attendance at each of the Tuesday meetings that you

17    led?

18      A    Correct.  The entire field team was required to

19    be on these calls.

20      Q    All right.  And then other than that, other than

21    those Tuesday calls, generally, Charles would have been

22    the point of contact to manage Daniel day to day?

23      A    Yes.

24      Q    Okay.  Did you interview Daniel before he was

25    hired?

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1     A    Yes.

2     Q    All right.  Did Charles also?

3     A    Yes.

4     Q    Did anyone else interview Daniel?

5     A    No.

6     Q    And I'm going to -- I will come back to Daniel

7  in just a moment, but you did give me a couple of other

8  categories that you manage, and so I want to just

9  understand them both a little bit better.  You

10 mentioned both education and major events, so let's

11 take those in turn.  You said you managed global

12 education.  What does education look like in your

13 industry -- well, no, how did -- what does education

14 mean in this content?

15    A    Education is educating our field team.  It's

16 educating new retailers that are interested in

17 retailing Stila.  It's holding Zoom meetings with Hong

18 Kong to educate their field team.  It is writing

19 content that gets e-mailed out.  It's building websites

20 for e-learning for all retailers.  It is digging into

21 ingredients to know what they do and sharing that.

22 It's going into Ultas or flying out to other retailers

23 and training their trainers in person how to use

24 something, what it is, why it's better than others.

25    Q    Okay.  I think that's clear.  I don't think I

Exhibit 3, Page 47

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1  pleased with his performance and based on some of his

2  actions, it brought to light things that had happened

3  prior to that, even before those six months that made

4  me question his work ethic.

5      Q    You mentioned you were not pleased, and that

6  some of his actions brought to light things prior to

7  those six months.  Okay.  So let's take those in turn.

8      A    Okay.

9      Q    What ways were you not pleased with his

10  performance?

11      A    He was not turning in his recaps on a timely

12  manner.  Those were due to Charles.  They were due to

13  our events manager, and then they would compile and

14  give them to me, and then I would have my calls with my

15  bosses, and I would have to intervene and actually

16  chase him for these recaps.  I found a lot of

17  discrepancies in his recaps when we finally received

18  them.  His sales towards the end were not great.

19      Q    That's a lot of categories, I just want to make

20  sure, anything else?

21      A    At the moment, no.

22      Q    Okay.  And then that's one point I didn't say at

23  the beginning, you know, you may occasionally remember

24  additional details later on, or, you know, you may

25  realize you want to clarify something.  If you ever

NICOLE MARR                                          JOB NO. 1773642
JULY 09, 2025

1    want to clarify anything on the record or supplement

2    your previous testimony, just let me know and you can

3    do that.  And we're going to take a break here in not

4    too long, that's another point, if you ever need to

5    take a break throughout today, just let us know, we'll

6    accommodate.

7        A    Okay.

8        Q    All right.  So --

9        A    Sorry.  I do want to mention something as

10   things are coming back to me.  There were -- there were

11   some instances where we would have to talk to him about

12   expenses, what I felt was taking advantage of the

13   company.  There were times -- multiple times that we

14   had to speak to him because he was going over his

15   budgets quite frequently.

16       Q    Yeah.  Go ahead, anything else?

17       A    For now, no.

18       Q    Okay.  Sound good.  I just want to be clear

19   here, when you say talking to him about expenses,

20   taking advantage of the company, is that a different

21   issue from going over budgets?

22       A    Yes.

23       Q    What budget do you mean?

24       A    We give each of the account executives a

25   freelance budget, so they know how many hours they can

NICOLE MARR                                          JOB NO. 1773642
JULY 09, 2025

1    put freelancers into their stores based on the needs of

2    the stores, if they're high volume, if they're -- have

3    a large number to anniversary, if it's an event, and he

4    would continually spend more than he was allotted, we

5    would find that he was overbooking in stores.  He was

6    talked to a few times about that.

7       Q   And so -- and I think -- well, did you want to

8    describe anything else related to the budgets before I

9    move on?

10      A   For that budget, no.

11      Q   Were there any other budgets that he went over?

12      A   No.  Okay.  All right.

13      Q   So, yeah -- and I'll come and ask you some more

14   questions about each of the things you just listed in a

15   moment.

16          You mentioned, like, that based on his actions,

17   that his actions in the last six months brought to

18   light things even prior to that six months that made

19   you question his work ethic --

20      A   Yes.

21      Q   -- I believe.  Now, we've already sort of talked

22   about him not turning in recaps on time as expected,

23   these budget issues, and the expenses -- you said the

24   sales towards the end were not great.  Were there any

25   other actions that you meant when you said -- that

Exhibit 3, Page 50

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1   brought to light things for you?

2       A   Can you rephrase that?

3       Q   Yeah.  You said that based on his actions in the

4   last six months, it made you question his work ethic.

5   So did you mean any actions besides those related to

6   not timely turning in recaps, sales numbers not being

7   great, going over budgets, and excessive expenses, do

8   you remember any other actions that made you question

9   his work ethic?

10      A   Yes.  There were times that I would go into a

11  store because I'm local to Los Angeles, and he was

12  supposed to be there, and he wasn't.  There was an

13  incident at an event in Las Vegas that brought to light

14  something that he had done at the same convention the

15  year prior that made me think, well, geez, now, I was

16  giving him the benefit of the doubt, but I'm seeing

17  patterns here.

18      Q   Anything else?

19      A   Yes.  I also found that he was using his

20  freelance to educate other freelance, which is not

21  acceptable with Stila.  The account executive

22  interviews, hires and educates their personal freelance

23  in their stores.

24      Q   Anything else?

25      A   Not at the moment.

Exhibit 3, Page 51

NICOLE MARR                                              JOB NO. 1773642
JULY 09, 2025

1      Q   All right.  I always ask the same question after

2   a break.  Ms. Marr, do you understand you're still

3   under oath?

4      A   Yes.

5      Q   I'm going to take you through -- you gave me a

6   long list of performance-related issues before we took

7   our break.  So I'm going to just go through and ask you

8   some details about each of those things in turn.

9      A   Okay.

10     Q   You mentioned something called a recap.  What's

11  a recap?

12     A   We have a few recaps.  We have a weekly recap.

13  There is a high-level recap that is due to me from

14  every field member at the end of their week because the

15  field is off on Mondays, and that's when I have my

16  calls with my bosses, so they're to have to me by

17  Saturday evening, Sunday.  If they don't want to work

18  on Sunday, they can do it before they leave a store on

19  Saturday, but just very high level of their week, what

20  stores they visited, any issues they need to call out,

21  anything in the stores that I need to know about, so

22  that when I'm talking to my bosses I can share that.

23         There's also a formal recap of all their events

24  over the weekend that they complete on Tuesdays.  There

25  is a sales recap that they do weekly, which would --

Exhibit 3, Page 52

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    where did your stores end for the week?  How much

2    freelance budget did you use?  What do you have left

3    for the month?  And, really, balancing the checkbook,

4    personally.

5         This is why we give them a full office day on

6    Tuesdays to complete those.

7    Q    To complete the weekly sales recap?

8    A    And their checkbooks.

9    Q    Okay.

10   A    And their event recaps -- well, their checkbook

11   and the weekly sales, that's kind of the same form.

12   Q    Okay.  Got it.  Okay.  So it will be correct to

13   call the weekly sales recap the checkbook, they're the

14   same thing?

15   A    It covers what did your stores do prior?  What

16   were they up against?  Where were you?  How much

17   freelance money did you spend?  Balancing it out so you

18   know how much you have left for the month.

19   Q    So that managing of the freelance spend, is that

20   sort of what you're referring to as the checkbook?

21   A    Yes.

22   Q    I just want to make sure I am clarifying.  So I

23   think you described two recaps, the weekly sales recap

24   due on Tuesdays and the high-level weekly recap due at

25   the end of each week?

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1       A    Plus they have -- if they have events, there is

2    a form to be filled out for each event.

3       Q    Got it.  Okay.  And those events are typically

4    held on Saturdays, right?

5       A    Correct.

6       Q    So, those Tuesday office days are designed to

7    allow the account executives, like Daniel, to prepare

8    and submit their recap of all events and separately

9    their weekly sales recap for their stores -- the doors

10   that they're responsible for?

11      A    Those are two responsibilities for Tuesday.

12   There are other responsibilities as well.

13      Q    Did you see deficiencies in Daniel's performance

14   in any areas -- well, no, no, no, please strike that

15   question.

16          So you said that Daniel had not been turning his

17   recaps in in a timely manner.  Were you referring to

18   any specific one of those three categories you gave,

19   the high-level weekly recap, the event recap, and the

20   weekly sales recap -- so, actually, now I'm asking two

21   questions so let me back up -- is it correct for me to

22   say the three types of recaps that Daniel was

23   responsible for turning in on a weekly basis to you

24   were the high-level weekly recap due on Saturday night

25   or Sunday, the recap of the -- the events due on

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    A    I believe so.

2    Q    And then those issues resolved?

3    A    He got better with those, yes.

4    Q    Any other -- any other dynamics or events you

5    can think of, you know, with, you know, let's say not

6    being truthful, or, you know, not following -- not

7    working in the best interest of the company, as you

8    said?

9    A    Well, we briefly discussed him having freelance

10    train other freelance, which is definitely not in the

11    best interest of the company.

12    Q    Let's talk about that:  When did you first learn

13    him having freelance train other freelance?

14    A    I actually went into a Burbank store --

15    sometimes I will go out when I have kind of a light

16    call schedule -- I will go out and I will hit a pocket

17    of stores and just see what's going on in the stores,

18    and I decided to go into the Valley, and one of those

19    stores is Burbank and it was on his schedule, so I

20    reached out to Charles -- and since Los Angeles is part

21    of Charles' territory, even though I am his superior, I

22    always keep him in the loop when I'm going into the

23    stores.  I said, okay, I'm going to go see this store,

24    and this store, Daniel should be in Burbank, so I'm

25    going to pop in there, and when I got there, Daniel was

Exhibit 3, Page 55

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    not there, and there was a new freelancer and a

2    freelancer that had been with us for a while.  And so I

3    reached out to Daniel about that and come to find out

4    he was in a different store -- he reported to me he was

5    in a different store -- and he was having one

6    freelancer train the other freelancer, which is not

7    acceptable.

8           Charles was not aware this was happening and

9    unless you are at an event, we never have two

10   freelancers in the same store.  It was a waste of

11   freelance payroll to have them in the same location.

12       Q    Now, you said Daniel was in a different store --

13       A    That's --

14       Q    -- sorry -- yeah, what was he doing in that

15   other store?

16       A    He reported to me that he decided to visit a

17   different store, but he did not change his schedule.

18   He did not alert Charles to that change.  At the time,

19   I took him at face value, benefit of the doubt, just

20   that he was in that other store.

21       Q    Do you remember when this Burbank incident was?

22       A    I don't have the exact date.

23       Q    Okay.  Now, what did he tell you that, if

24   anything, that he was doing, like -- let me ask a

25   different way.

NICOLE MARR                                                    JOB NO. 1773642
JULY 09, 2025

 1          Did he tell you why he had decided to go to that

 2    other store?

 3      A    I don't recall what his reasoning was.

 4      Q    Did he ever tell you -- well, did he -- do you

 5    remember if he mentioned that he was prepping for an

 6    event at the other store?

 7      A    That was actually a different situation.

 8      Q    Okay.  What -- tell me about that other

 9    situation, then.

10      A    Sure.  Again, I was out visiting stores, and so

11    I went into more of the North Valley stores, and I went

12    into a small location called Sherman Oaks that he was

13    scheduled in that day, and when I got there, once again

14    there were two artists in the store and no Daniel.  So

15    I texted Daniel after I called -- I called Charles

16    first, and I said I'm in the store, Daniel's not here,

17    and there's two artists which is a no-no, and I said do

18    you know where Daniel is, and he said no.

19          So I texted Daniel and he was in a different

20    Sherman Oaks location, so in the same area, and he told

21    me that he was dropping off supplies for an event that

22    was happening that weekend.

23          So once again, I'm giving him the benefit of the

24    doubt.  I didn't ask for any proof that he was at this

25    other store, but we had a discussion again with him

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    about having two artists in the same store, which is

2    not okay, but that would have been the second time that

3    he was not where he was reporting he was going to be.

4        Q    Okay.  Did Daniel -- what explanation did he

5    provide, if any, for being at the other location and

6    the two artists in the same store?

7        A    As I shared, he told me he was dropping off

8    event supplies for an event happening the next day.

9        Q    Okay.  Yeah.  So let me ask a better question.

10   That explains, perhaps, why he was at the other store,

11   but how did he explain, if at all, why there were two

12   artists in the same store?

13       A    In this situation, he told me that he had added

14   a store-generated event to this door, which we normally

15   do not have store-generated events with two people on a

16   weekday.

17       Q    Was it within his discretion to add such a

18   store-generated event?

19       A    It definitely is within his discretion; however,

20   store-generated events are preplanned and they are

21   submitted to Hailey, who is our events manager, and

22   there was no -- no store-generated event submitted to

23   her for that day.

24       Q    Did you talk to the store about whether or not

25   there was a store-generated event?

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

 1    A   Yes.  There were two others.

 2    Q   Okay.  Now, since we're here -- I'm going to

 3  show you an exhibit, which I believe recaps those

 4  events -- and one moment -- and one moment -- this is

 5  Exhibit 5.  It's been shared in -- it's been published

 6  in previous depositions, and it's a document produced

 7  by defendants' counsel as -- I'll tell you the number,

 8  one moment -- all right.  Is this big enough for you to

 9  read, Ms. Marr?

10    A   Yes, it is.

11        (Exhibit No. 5 marked for identification.)

12  BY MR. GUHA:

13    Q   All right.  This is a two-page document produced

14  by defendant as Stila -- Bates stamped Stila 200 and

15  201.  So I'm going to go through this slowly, Ms. Marr,

16  and my first question is do you recognize this

17  document?

18    A   Yes.

19    Q   Okay.  What is this?

20    A   This was an e-mail that I sent to Karen Tuey

21  documenting the four instances of Daniel not being

22  where he was supposed to be.

23    Q   Okay.  Why did you send this e-mail to Mr. Tuey?

24    A   Because documentation needed to happen since we

25  had talked to him about these instances.

1     Q   Do you know if this was sent in connection with

2   his termination?

3     A   I believe so.

4     Q   Okay.  Is it fair to say that you were sending

5   this to document the reasons -- at least some of the

6   reasons -- for Daniel's termination?

7     A   Correct.

8     Q   All right.  So this Burbank -- the first bullet

9   says Burbank location.  Is this the Burbank incident I

10  think you described to me a few moments -- a few

11  minutes ago?

12    A   Correct.

13    Q   This one doesn't have a date.  Do you have any

14  idea how long before Sherman Oaks this was?

15    A   No, I do not.

16    Q   All right.  Do you believe that it happened

17  within the last six months of Daniel's employment?

18    A   Yes.

19    Q   Let's see -- you know, you have this information

20  here -- did you keep any notes from that day, or, you

21  know, did you make any notes for yourself close to that

22  day about what happened at the Burbank location?

23    A   In an e-mail, no.

24    Q   What about for yourself, anything in writing?

25    A   No.  Just communication between Charles and I

NICOLE MARR
JULY 09, 2025                                          JOB NO. 1773642

1   that I was there and Daniel was not, and that there

2   were two artists there, and, furthermore, that Kamron

3   was training Tori, which is not acceptable.

4       Q    Okay.  What -- why -- just curious, why is it a

5   misuse of payroll to have two artists in one location,

6   I mean, for example, if the two artists generate twice

7   the sales, is that still a misuse?

8           MS. STRIKE:  Objection.  Speculation.

9           MR. GUHA:  Yeah.  And it's compound too, so my

10      question is no good.  Let me ask a better question.

11  BY MR. GUHA:

12      Q    Were there ever instances -- let me just ask the

13  first question -- why is it a misuse of payroll to have

14  two artists in one location?

15      A    Because we believe in dividing and conquering

16  and unless it is an event where you have a larger goal,

17  two artists in a store are not going to generate enough

18  sales to cover their payroll.

19      Q    Okay.  Did -- well, no, I'll come back to that

20  later -- okay.  So and why should an artist not be

21  training another artist?

22      A    Because they're not a Stila employee.

23      Q    And since they're not a Stila employee, why does

24  that mean they shouldn't be training another artist?

25      A    Because the Stila employee has been educated by

NICOLE MARR                                                    JOB NO. 1773642
JULY 09, 2025

1    Stila on how to educate an artist.

2        Q    Okay.  Did Daniel give any justification for why

3    -- well, pardon me -- you spoke with Daniel about this

4    incident at Burbank, right?

5        A    Yes.

6        Q    Did Daniel give any explanation for why he had

7    assigned Kamron to train Tori?

8        A    Yes.  He told me that he and Charles were

9    talking about trying to elevate Kamron in his role as a

10   freelancer, and afterwards I spoke with Charles about

11   that, and he said it was never discussed to have Kamron

12   train other artists.

13          The discussion was around elevating him to

14   actually run a few store-generated events on his own.

15   We had Kamron in certain stores, and he was building

16   relationships with those stores, so we felt that we

17   could allow him to -- to schedule these store-generated

18   events.  If you recall, they are prescheduled, they're

19   scheduled with the store.  They're confirmed, and then

20   they're given to Hailey, who then tracks these events,

21   and in lieu of Daniel not being able to be in some of

22   these stores all the time, we felt that Kamron was

23   strong enough to talk to management and say I would

24   love to have a store-generated event next Saturday.

25   Will you give me the space in the front of the store,

1  and give Kamron a banner and a tablecloth, and samples,

2  so that he could then create that in the front of the

3  store.

4      Q   Did you ever hire Kamron as an account

5  executive?

6      A   No.

7      Q   Did you ever consider hiring Kamron as an

8  account executive?

9      A   No.

10     Q   Did -- did Daniel say that he had believed it

11 was within his discretion to assign Kamron to train

12 Tori at least this time?

13     A   He did not verbally say those words, but he did

14 admit that he did have Kamron go in and train Tori.

15     Q   No.  My question is -- I guess I should have

16 asked a better question.  Did he -- did he understand

17 that you considered it a violation of policy to have

18 Kamron train Tori when he assigned Kamron to train

19 Tori?

20         MS. STRIKE:  Objection.  Lacks foundation.

21         MR. GUHA:  Okay.  And I can see how that --

22     that can happen.

23 BY MR. GUHA:

24     Q   So, did he say whether or not he believed he was

25 violating any rule by assigning Kamron to train Tori?

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    A    I would not say that it is a rule.  It is the
2    way we do things at Stila; is, that a Stila employee is
3    the one educate a freelancer.  He did say that he
4    thought it was okay because he had had a conversation
5    with Charles about elevating Kamron, and so to go back
6    to your question earlier about if I had any written
7    communications about this Burbank incident, I did not,
8    because at the time I took him at his word.  I gave him
9    the benefit of the doubt.  He made a mistake.  We spoke
10   about it.  Kamron should not be training Tori, and we
11   moved on, which is the same reason I did not ask him to
12   prove that he was at the store he said he was at.
13   Q    That's probably also why you don't have a date
14   there, right, because --
15   A    Correct.
16   Q    Okay.  All right.  And did he also express to
17   you that he had -- he was under any misunderstanding
18   about having two artists at one location, you know, for
19   a regular sales day as opposed to an event?
20   A    He did not, and that is a conversation in
21   writing that is shared quite often with the team on
22   agendas with the entire field team where
23   store-generated events are typically one person, larger
24   events are two people.  We had very specific goals, and
25   depending on that goal is how many people you assign to

Exhibit 3, Page 64

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

```
 1   that store.
 2       Q   Do you remember any incidents prior to this
 3   Burbank incident where he had scheduled two artists in
 4   one location?
 5       A   Prior to this incident, no, I didn't have reason
 6   because I trusted him that he was following our
 7   guidelines.  Towards the end, I -- I did question
 8   because I had lost trust, and we have a portal for
 9   booking our freelancers, and I started going into the
10   portal and looking at where our freelancers were
11   scheduled, and what I ended up finding was time after
12   time he had two artists in the same store, and I
13   further found discrepancies where he had two artists in
14   a store that he was personally scheduled at that day.
15       Q   Did that cause you to question whether he, in
16   fact, had been at the store on those days when two
17   artists -- when you found that two artists had been
18   scheduled?
19       A   Correct.
20       Q   Did you ever ask him about whether he had ever
21   failed to report on any of the days in which you
22   uncovered two artists had been scheduled?
23       A   No.  Because when I started looking into that
24   was after the Cerritos location incident in November,
25   so between that Cerritos incident and the Seal Beach
```

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    incident is when I uncovered further information.  We

2    had already had the discussions about having two

3    artists in store.

4        Q   Okay.  Got it.  Yeah.  And so if I understand

5    your testimony correctly, the two times when you spoke

6    to him -- pardon me -- if I -- is it correct that to

7    your best recollection, you only spoke with Daniel

8    twice about not scheduling two artists in one location?

9        A   Not only those two times, but, yes, on those two

10   times, and as stated earlier, it is a guideline that is

11   shared with the entire team.  We review it quite often

12   on our group calls, so he was fully aware of our

13   guidelines, and, then, yes, I had discussions with him

14   and that included the Burbank time, the Sherman Oaks

15   time.

16       Q   Okay.  And, yeah, thank you for reminding me.

17   So other than these weekly conversations with the whole

18   team where those admonitions were given, and these two

19   one-on-ones with Daniel about Burbank and Sherman Oaks.

20   Do you recall any other times when you personally

21   discussed with Daniel the -- that he should not have

22   two artists in one location?

23       A   Not that I can recall at the moment.

24       Q   Okay.  Now, let's see -- regarding Burbank --

25   and I'm sorry if you testified to this already, I

Exhibit 3, Page 66

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    times that you're going to have the worst week.

2         A lot of this position that Daniel was in was

3    about his relationship with the stores -- his

4    relationship with corporate.  He was the liaison.  He

5    was the eyes for us out in those stores.

6         So when we lose trust in him that he's out in

7    those stores doing what he's supposed to do, it's very

8    hard to work with someone then.

9    Q    Okay.  I understand.  Let's talk about the

10   Cerritos location incident, November 18th, and I think

11   you mentioned earlier the reporting personal sales of

12   600.  Can you take me through the events recounted

13   under the Cerritos location?

14   A    Yes.  So this is the one I spoke to earlier,

15   where his recap shared that he had personal sales of

16   600.  The entire week that store only sold 400.  I

17   questioned him into an e-mail about the sales that they

18   didn't add up.  He replied something very vague about

19   it being a slow day, maybe there was a return.  It

20   didn't sit right with me, so I called the store --

21   every single person, whether you're freelance, account

22   executive, regional, if you go into a store to work for

23   the day, you sign in what's called a vendor log.  When

24   you get there, whoever the manager on duty is or the

25   person working the cash rep, pulls out the vendor log,

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    you sign your name.  You put the time that you're

2    there, they check your purse to make sure everything is

3    good, you start your day.

4         We speak to this monthly.  It is a nonnegotiable

5    with Ulta that you sign in every time, and you sign out

6    when you leave.  When you sign out, they check your

7    purse for theft, so it's a nonnegotiable.  I called the

8    Cerritos store and asked them to look at the 19th to

9    see if my executive was there in the store that day,

10   and they reported that there was no Daniel in their

11   sign-in log for the 19th.

12        They did report that there were two artists in

13   the store, and they gave me the names of Julia and

14   Ally.

15        So I did call Julia, and I asked her if she was

16   working on the 19th, and she said yes she was working

17   there with Ally, and I said was Daniel in the store

18   with you that day, and she said no.

19        So in an e-mail, I asked him to confirm he was

20   in that correct location in Cerritos that day, and he

21   e-mailed back that he was.

22        He eventually submitted mileage for this store.

23   We questioned his mileage, and then went back to look

24   at his calendar, and he had changed his calendar to

25   show a different store.  We questioned him on this.  At

NICOLE MARR                                          JOB NO. 1773642
JULY 09, 2025

1    that point he -- I want to say came clean.  He admitted

2    that he actually was not even in a store that day, and

3    he -- there was an emergency, and he had to leave.

4        Q    What was the emergency?

5        A    If I recall, he shared that one of the freelance

6    artists called him because she was having some medical

7    issues, and so he went to go meet with her.

8        Q    And did you -- oh, I'm sorry.

9        A    This all could have been shared in his recap.

10   We -- we pride ourselves at Stila about being open and

11   honest in communication, and I truly believe if he had

12   submitted a recap that said I was scheduled in

13   Cerritos, there was an issue with an artist, I went to

14   meet with her, this is what I did for the day, he told

15   us he finished at a different store, he had put all of

16   this into an e-mail versus lying about his personal

17   sales and lying about being there, I think we could

18   have had a discussion about it, but this was once again

19   lost trust.

20       Q    Did you discuss with that freelancer that Daniel

21   said -- had some sort of a medical emergency, whether

22   or not that aspect of his account was true?

23       A    No.  I didn't believe I needed to.

24       Q    Okay.  Well, I guess, why not?  Why did you

25   believe you didn't need to is a better way to ask.

NICOLE MARR                                              JOB NO. 1773642
JULY 09, 2025

1        A    Well, he had already lied about his sales, lied

2    about the location that he was at, furthermore,

3    submitted mileage for this location, and then found out

4    he wasn't there.  No sign-in on the vendor log, and an

5    artist who confirmed that he wasn't there.

6        Q    He said -- it sounds like -- okay.  Did he ever

7    say that the vendor log was -- that there was no longer

8    any space on the vendor log for him to sign in?  Did he

9    ever speak about that in any of these instances?

10       A    I had been working with Ulta in some capacity

11   since 2009.  I used to go into Ultas and this does

12   happen where there's no more room.  I personally have

13   flipped the page over even if there's no lines and

14   written my name in.  I've gone and asked a manager for

15   a new sheet, and the guidelines with us here at Stila

16   is if there's no place for you to sign or they can't

17   find the log, you still have a paper trail that you

18   were in store, and you text your AE, or you text your

19   regional.  I am here at store 52.  They can't find the

20   log, it's 12:00, I'm here.  That is shared -- once

21   again, we review that at least once, if not more a

22   month, because, again, it's a nonnegotiable with Ulta.

23            We want our team to be covered if there's any

24   instances like this that, hey, here's my record I was

25   where I was supposed to be.

Exhibit 3, Page 70

NICOLE MARR                                              JOB NO. 1773642
JULY 09, 2025

1    Q   Did you ask Daniel why he hadn't done those

2    things, like, flip the page over or text, I guess,

3    Charles in this case?

4    A   No, I did not.  At this point, I had completely

5    lost trust in Daniel.  It went further than not just

6    signing the vendor log.  We had confirmation that he

7    was not there.  He admitted afterwards that he was not

8    there.  So I don't think asking him why he further lied

9    about the paper being full was important.

10   Q   Can I just ask you, though, here it says -- it

11   says stating he was in store early but left for an

12   emergency.  So is it correct that Daniel at least told

13   you that he had come to the store at some point?

14   A   He did share that he did, but, again, he did

15   not sign the vendor log, and we had confirmation from

16   Julia that, no, he did not go to that store that day.

17   Q   Okay.  Is it possible that he went there to set

18   up or something before Julia or Ally arrived?

19       MS. STRIKE:  Objection.  Speculation.  Lacks

20   foundation.

21   BY MR. GUHA:

22   Q   Yeah.  I'm just asking, do you know for a fact

23   that that didn't happen?

24       MS. STRIKE:  Same objections.

25       THE WITNESS:  Do I need to answer that, Cara?

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1  said he sold $600, and he was there before Julia was

2  there to see him.  She was there early in the morning,

3  so it -- none of it adds up.

4      Q   Okay.  All right.  That makes sense.  Let's go

5  to Seal Beach 11/25.  Can you -- yeah, would you just

6  describe -- go ahead and take some time to review if

7  you'd like, and I can keep scrolling down.  It looks

8  like there's a couple of screenshots here.  Why don't

9  you tell me what you'd like me to do.  Would you like

10 me to just -- is this enough for you to start

11 describing what happened this day, or would you like me

12 to scroll down?

13     A   If you want to give me a minute to read it.

14     Q   Yeah.  Please.  Let me know when you're done.

15     A   Okay.  Yes.  At this point, I have completely

16 lost trust in Daniel.  I now have three incidences

17 where he was not where he was supposed to be, and so on

18 this particular day, I waited until 12:30, so he was

19 supposed to be there at 10:00, and I called the store

20 at 12:30.  I asked them if there was anybody from Stila

21 there that day, and they checked the vendor log, and

22 they said there's no one signed in.  You can see the

23 store usually from where the phone is, and they said

24 they didn't see anybody over there.

25          So I reached out to Charles and I said this is

NICOLE MARR                                                              JOB NO. 1773642
JULY 09, 2025

1    what's going on.  And he said let me ask him how his

2    sales are for the day and where he is, and it was a

3    group thread, and Daniel said, oh, I'm in Seal Beach,

4    and I've sold 279.

5         So I then replied, Daniel, I called the store.

6    They said you're not there.  We didn't hear from him

7    for 20- 30 minutes.  He lives very close to this

8    location, then he texted a picture of the vendor log

9    that said -- yeah, that picture there -- 11:00 to 6:00,

10   and he cropped it so that you couldn't see the person

11   prior who had signed in.

12        So it really did not give me any proof that he

13   had been there when he was supposed to be.  I had no

14   idea if he just showed up.  I asked him why it was

15   cropped this way, and he said that it was for -- I

16   think he had mentioned -- or this may have been during

17   his deposition, he had mentioned it was because of

18   privacy.  He didn't want us to see other people's

19   names, but there are ways to prove that you're in

20   store, even if you put your hand over the names and

21   just showed the times.

22   Q   Did you -- oh, I'm sorry.

23   A   Also, we don't write a schedule -- it's not a

24   schedule log, it's a sign-in and sign-out log.  So it's

25   very odd that he wrote the times he was going to be

1    there versus what time he actually got there.

2        Q    Have you ever seen -- did you find any other

3    incidences where he signed his log this way, like a

4    schedule log rather than an in-and-out log as you just

5    described?

6        A    No.  The -- because the past three incidences he

7    wasn't signed in.  He wasn't there.

8        Q    Okay.  Right.  You were -- did you search --

9    pardon me -- did you request any sign-in log from

10   Burbank or Sherman Oaks?

11       A    No.  I was personally in those stores and spoke

12   to both Kamron, Tori, the same artists at both of those

13   locations.  He had admitted to me on both of those

14   locations that he was not there, so there would be no

15   reason to go look at the log.

16       Q    So I kind of -- I guess, I kind of

17   misunderstood, did he say -- with respect to both

18   Burbank and Sherman Oaks, did he say that he had never

19   reported to those stores at all on the day --

20       A    Correct.

21       Q    Okay.  That's what he told you?

22       A    Yes.

23       Q    Okay.  And I just want to make sure I understand

24   Sherman Oaks was the location where he said he was

25   going to set up for another event, right?

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1  before he was asked to sign it?

2      A    We reviewed it as a team before we asked him to

3  sign it.

4      Q    Did you do a video conference to review it?

5      A    Yes.

6      Q    And when you say "we," do you mean you, Charles,

7  and Daniel met via videoconference?

8      A    Yes.

9      Q    Anyone else attend that?

10     A    No.

11     Q    And did Daniel -- was Daniel notified that he

12  was being placed on a PIP before he attended that

13  meeting?

14     A    I don't recall if we stated that was the reason

15  for the call.  We -- we actually brought Daniel to an

16  in-person meeting in the Glendale office with Charles

17  to discuss his performance about two to three months

18  prior to the PIP and just had a very good open

19  conversation about some things that we felt were

20  lacking in his performance that we wanted to see some

21  improvement on.  We were helping to coach him, and then

22  after -- just like it states in here, the last 60 days

23  we didn't see an improvement.  We thought is was best

24  to give him a PIP to really lay out what we wanted to

25  work with him on, and that's where this came.

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1   you've been lacking, and we really just need you to try

2   a little bit harder to get -- to get your things in on

3   time, and if you can't, if you need help, raise your

4   hand.  We're here to help you.  We have a pretty

5   open-door policy at Stila, and if he felt that things

6   were overwhelming, or there was too much, if he wasn't

7   comfortable going to Daniel [sic], he could have come

8   to me and discussed it with me.

9          I've had other account executives that may be

10  newer and don't understand Excel so well, and I've

11  taken time to explain it to them, so he absolutely

12  could have after this come straight to me and said I

13  want to discuss it further, he did not do so.

14     Q   When you gave this PIP to Daniel, had you -- you

15  had not made a decision -- sorry -- you had not already

16  decided to terminate Daniel when you gave him this PIP,

17  right?

18     A   Oh, absolutely not.

19     Q   You still believe that he could improve and be

20  successful at Stila going forward?

21     A   Absolutely.  We -- as we had shared -- spoken to

22  earlier, we had seen Daniel have some ups, and then

23  have some downs, and then, you know, we'd speak to him

24  and it would be up and then it would be down, and we

25  were hoping by putting all of this in writing and make

1   it official is that we would be getting him to get back

2   on that up and stay on that up.

3         We believed in Daniel.  We promoted him from a

4   freelance position into an account executive position

5   because we believed in him.

6     Q   Okay.  When was the moment that you believed

7   termination was appropriate for Daniel?

8     A   It was right after the Seal Beach incident.

9     Q   Okay.  All right.  The Seal Beach incident

10  occurred on November 25th, 2023; is that right?

11    A   I believe --

12    Q   And I can bring up the exhibit again if that

13  would help, of course.

14    A   If you need me to confirm the exact date, you

15  would have to show the e-mail.

16    Q   I'm happy to do that, one minute.  I'm bringing

17  back up Exhibit 5.  So here, to the best of your

18  knowledge, was it November 25th, 2023?

19    A   Yes.

20    Q   Okay.  What specifically happened -- of the

21  events of November 25th, 2023, what specifically

22  changed your mind from termination was not necessary to

23  no, based on this, termination is necessary.

24    A   I had completely lost trust in Daniel as an

25  account executive in the field.  Daniel was in a

NICOLE MARR
JULY 09, 2025                                          JOB NO. 1773642

```
1   investigated vendor logs prior even to the -- prior to
2   even the Burbank incident?
3         MS. STRIKE:  Objection.  Misstates prior
4      testimony.
5         MR. GUHA:  Yeah.  If I'm wrong about that,
6      please correct me.
7         THE WITNESS:  So between the Cerritos and the
8      Seal Beach is when I started investigating.
9   BY MR. GUHA:
10     Q   Did you find other -- well, I think you just --
11  you discussed a pattern, right, like, what was the
12  pattern that emerged?
13     A   Well, we had discussed with him after the
14  Burbank, and, again, after the Sherman Oaks when it was
15  appropriate to have two artists in a store.  So we had
16  two discussions about that, and in between the Seal
17  Beach -- sorry, the Cerritos and the Seal Beach.
18         I found numerous occasions that occurred after
19  those two discussions where he was still putting
20  multiple artists in a store.  Furthermore, he had those
21  artists in the same store that he was supposed to be in
22  on his schedule.
23     Q   Did you check the sign-in sheets for the stores
24  on those dates to see if he signed in?
25     A   No.
```

1    store, I'm losing money.

2         Now in an instance of an event, when it's a

3    corporate sponsored event, we have extra stock that

4    comes in, we give them deluxe samples.  We've got

5    makeup bags we're giving out.  We have all of the tools

6    in an event so that those two to three people are able

7    to sell $1,200 to 1,500, and I'm breaking even on

8    payroll that day.

9         Q    Okay.  Did you compare -- I'm sorry.  Did you do

10   an analysis of how much money -- did you do an anlysis

11   of how much of Daniel's payroll budget was misspent?

12        A    No, I did not.

13        Q    Were Daniel's sales numbers in November 2023

14   lower or higher than usual?

15        A    In November, I did an analysis of the last three

16   months that Daniel was with us, and it was about 33

17   percent of the time, he was the worst.  33 percent of

18   time he was in the top five, and 33 percent of the time

19   he was in the middle tier.

20        Q    Overall then he was sort of --

21        A    Average.

22        Q    Average.  Okay.  So it was not his sales numbers

23   that got him fired; is that fair?

24        A    Absolutely not.  It was complete lack of trust

25   that he was not in stores when he was supposed to be.

NICOLE MARR                                                    JOB NO. 1773642
JULY 09, 2025

1      Q   Did you give any information to her regarding
2   your loss of trust?
3      A   No.  It was a one-line response.
4      Q   Okay.  Do you know if Charles Miller Spoke with
5   JCPenney about Daniel?
6      A   No, he did not.
7      Q   Okay.  You know for a fact that he did not?
8      A   Yes, I do.
9      Q   How do you know that?
10     A   Because the person that reached out to me is
11  only in contact with me.
12     Q   I guess my question is how do you know they
13  didn't separately reach out to Charles?
14     A   I did ask Charles afterwards if he had heard
15  from JCPenney and he said no.
16     Q   Okay.  No.  That makes sense.  Did you receive
17  any other inquiries about Daniel from any prospective
18  employers?
19     A   No.  That was the only one.
20     Q   Did you ever discuss Daniel and his employment
21  with anyone other than this JCPenney communication
22  after Daniel's termination, but -- before today -- and
23  I'm not asking about any discussions with your
24  attorneys -- other than with your attorneys or a
25  spouse, for example, have you discussed Daniel with

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    anyone?

2        A    You're asking if I discussed Daniel with anyone

3    other than, like, Karen or Charles or Michelle?  No.

4        Q    Okay.  But you did discuss him in some capacity

5    with those three?

6        A    Well, of course, we were the three that were on

7    the Zoom when we let him go from Stila and Michelle as

8    the CEO has the final say if I recommend that somebody

9    is let go, so of course she was aware.

10        Q    Did she approve Daniel being terminated?

11        A    Yes.

12        Q    And did -- was Charles' opinion also sought on

13    regarding whether he believed Daniel should be

14    terminated?

15        A    The decision was already made before we let

16    Charles know.

17        Q    So who made the decision, ultimately?

18        A    I made the recommendation, and Michelle approved

19    it.

20        Q    Okay.  Had you spoken with Michelle -- and I'm

21    sorry, Michelle's the CEO, right?

22        A    Yes.

23        Q    What's her last name again?

24        A    K-l-u-z, Kluz.

25        Q    Did Ms. Kluz -- did you discuss with Ms. Kluz

Exhibit 3, Page 81

 1    the point where after we hung up, Charles, Karen and I

 2    got back on a video call, and we were all a little bit

 3    shocked that it went so fast, and he really didn't have

 4    anything to say.

 5        Q    Did he seemed surprised, as far as you're

 6    concerned?

 7        A    No.

 8        Q    What do you remember him saying, if anything?

 9        A    I don't recall at the moment verbatim what he

10    said.  I do remember myself being a little nervous, a

11    little upset going into this, I mean, it's never a fun

12    conversation or situation to be in, so I don't recall

13    exactly what it was, but I do recall that I was a

14    little bit shocked about how short the conversation was

15    and how little he had to say.

16        Q    How long before that conversation, where you

17    informed him, was your conversation with Ms. Kluz?

18        A    So I believe -- and I can look on a calendar --

19    I believe November 29th was a Saturday -- let me check

20    here -- was it the 29th or -- was it the 29th that was

21    the Seal Beach?

22        Q    I can bring -- let me bring up -- since I'm not

23    allowed to answer questions, let me bring up the

24    exhibit, and --

25        A    Yeah.  That would be great.

NICOLE MARR
JULY 09, 2025
JOB NO. 1773642

```
1      Q   Yeah.  I mean, I can clarify things, but I can't
2   -- I'll put it that way.
3          So it looks like this e-mail's dated November
4   29th, and then the Seal Beach thing it says 11/25, I
5   believe.
6      A   11/25 -- so, yes -- now, yeah, yeah -- okay.  So
7   the very next day is when I would have -- that very day
8   I reached -- I believe I reached out to Karen before I
9   even talked to Charles and said this is what I'm
10  thinking.  This is what I've decided, I'm going to go
11  to Michelle to get approval, but I have to loop Karen
12  in because she does payroll.  She does expenses.
13         So I needed to know if Michelle approves this,
14  will you be able to -- when would we say his last day
15  is?  Would you be able to have his last paycheck?  Do
16  we owe him any reimbursements, and as the HR
17  representative, I need you to be on the phone.  So once
18  she gave me all of that information, I would go to
19  Michelle.
20     Q   Okay.  And so then --
21     A   So November -- sorry -- November 25th was a
22  Saturday.
23     Q   Okay.
24     A   I believe I looped Karen in over the weekend to
25  give her a heads-up, and then on Monday, once she had
```

Exhibit 3, Page 83

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    all of the information, is when we looped in Michelle

2    for the final approval.

3        Q    Okay.  Got it.  Got it.  Okay.  Did Michelle ask

4    about any -- did Michelle mention anything other than

5    running the separation through ADP that was required

6    before Daniel's termination could be finalized?

7        A    No.  And none of the termination piece needed to

8    be run through ADP.  It was the performance improvement

9    plan that we ran through ADP because we were putting

10   him on a -- a written performance, so it was this is

11   what we're missing, this is what we need from you, this

12   is how we get there.

13       We wanted to make sure that it was very clearly

14   laid out, so that's why that went through ADP.  When it

15   came to the decision of letting him go, Michelle is the

16   one that came back and said I approve this based on

17   everything that you shared from the Cerrito's location,

18   the Seal Beach location.  Michelle was in Las Vegas

19   when he wasn't where he was supposed to be so she is at

20   -- she, herself, saw a few things that made her

21   question Daniel.

22       So when I proposed that we part ways, she was in

23   agreement.

24       Q    Okay.  All right.  So -- let me see here -- all

25   right.  I may be done for today, but it's -- well, let

NICOLE MARR                                                    JOB NO. 1773642
JULY 09, 2025

```
 1              MS. STRIKE:  That works.  I was going to ask
 2      for a break, so that's fine with me --
 3              MR. GUHA:  Okay.  Perfect.
 4              MS. STRIKE:  -- just to gather my thoughts.
 5              MR. GUHA:  Perfect.
 6              THE VIDEOGRAPHER:  Let me temporarily read us
 7      off the record.
 8          We are now off the record the time is 1:00
 9      p.m., Pacific Time.
10              (A recess was taken.)
11              (The proceedings resumed as follows:)
12              THE VIDEOGRAPHER:  We are now on the record.
13      The time is 1:11 p.m., Pacific Time.
14                       CROSS-EXAMINATION
15      BY MS. STRIKE:
16          Q   Good afternoon, Ms. Marr.  I just had a few more
17      wrap-up questions here.  Are you familiar with former
18      Stila employee, Mariano Testa?
19          A   Yes.
20          Q   Did you ever witness Mariano Testa engage in
21      inappropriate behavior towards Daniel Medina?
22          A   No.
23          Q   Did you ever witness Mariano Testa engage in
24      inappropriate behavior towards any other employees?
25          A   No.
```

NICOLE MARR                                              JOB NO. 1773642
JULY 09, 2025

1      Q    Did Daniel ever complain to you that Mariano

2    Testa had engaged in inappropriate behavior towards

3    him --

4      A    No.

5      Q    -- or anyone else?

6      A    No.

7      Q    Were you at the Ulta 2022 Conference in San

8    Antonio?

9      A    Yes.

10      Q    Did you witness any inappropriate behavior of a

11    sexual nature from Mariano Testa at this conference?

12      A    No, I did not.

13      Q    Were you at the Ulta 2023 Conference in Las

14    Vegas?

15      A    Yes, I was.

16      Q    Did you set a dress code for the Stila team for

17    this conference?

18      A    Yes.  I set the dress code for the entire

19    company that would be in attendance.

20      Q    What was the dress code?

21      A    We ordered beige Polo shirts that had our logo

22    embroidered, and I chose white bottoms of any type,

23    their choosing.

24      Q    Can you describe more what you mean by white

25    bottoms, so what sorts of examples could -- could and

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    did folks wear for the 2023 conference?

2        A    Sure.   The theme -- we have a theme for the

3    booth every year, and we build a booth, and we actually

4    built a 1970's era Las Vegas motel, very cheesy

5    looking, and so a couple of us chose white tennis

6    skirts to go with the beige Polo tops.   It looked very

7    cheesy 1970s, and we told the gentlemen and the women

8    who were not comfortable with skirts that white pants

9    of any type would be acceptable, so we had some in

10   white jeans.   We had some in white palazzo pants.   We

11   just -- the only thing they had to be was white.

12       Q    Did anyone raise any concerns or complaints

13   about your dress code or the dress code that you had

14   set in wearing white pants?

15       A    No.

16       Q    Did Daniel raise any concerns about having to

17   wear white pants at this conference?

18       A    Not to me, no.

19       Q    Was Mariano Testa in attendance at the 2023

20   conference in Vegas?

21       A    Yes, he was.

22       Q    Was Daniel in attendance at the conference?

23       A    Yes, he was.

24       Q    Did you witness any inappropriate behavior of a

25   sexual nature from Mariano Testa at this conference?

NICOLE MARR
JULY 09, 2025

JOB NO. 1773642

1    A    No.

2    Q    While Daniel was employed, how could a Stila

3    employee raise a concern or a complaint about if they

4    felt that they were experiencing sexual harassment?

5    A    They should immediately go to their supervisor.

6    Q    Is there anyone else who they could go to?

7    A    They could go to anybody on the executive

8    leadership team.

9    Q    Can you provide some examples of who that might

10   be on the executive leadership team that they could go

11   to?

12   A    That would be anyone from a vice president to a

13   chief.

14   Q    So who is in that executive team?

15   A    That would be Michelle, the CEO, our chief

16   marketing officer, the chief growth officer, our senior

17   vice president, our CFO, anybody vice president or

18   chief is -- is on that leadership team.  If it's an

19   account executive that has an issue, they could

20   certainly go to their regional, or they could come to

21   me, or they could go to my senior vice president.

22   Q    So I had asked you about the processes related

23   to sexual harassment.  Is that the same process that

24   employees could go to if they had any concerns about

25   any inappropriate behavior that they were experiencing

Exhibit 3, Page 88

NICOLE MARR                                        JOB NO. 1773642
JULY 09, 2025

```
 1                    CERTIFICATE OF REPORTER

 2

 3    STATE OF FLORIDA

 4    COUNTY OF SEMINOLE

 5

 6          I, Susan Mullen, Court Stenographer, certify

 7    that I was authorized to and did stenographically

 8    report the deposition of NICOLE MARR; that a review of

 9    the transcript was not requested; and that the

10    foregoing transcript, pages 4 through 23, is a true and

11    complete record of my stenographic notes.

12          I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the parties'

15    attorneys or counsel connected with the action, nor am

16    I financially interested in the action.

17          DATED this 1st day of August, 2025.

18

19

20

21    _____

22    Susan Mullen, Court Stenographer

23

24

25
```