# Exhibit 10

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   DANIEL MEDINA, an individual,      )
                                        )
 5             Plaintiff,               )
                                        )
 6        vs.                           ) Case No. 2:24-cv
                                        ) 06340-FLA(RAOx)
 7   STILA STYLES, LLC, a Delaware      )
     limited liability company;        )
 8   MARIANO TESTA, an individual;     )
     and DOES 1-25, Inclusive,         )
 9                                      )
               Defendants.              )
10   _____)

11

12

13            VIDEOTAPED DEPOSITION OF DANIEL MEDINA

14                 LOS ANGELES, CALIFORNIA

15                 TUESDAY, MAY 27, 2025

16                      9:20 A.M.

17

18

19

20

21

22   FILE NO. 17019
     REPORTED BY LEESA DURRANT, CSR NO. 11899, RPR
23

24

25
```

Exhibit 10, Page 6

Daniel Medina

```
 1    would affect your ability to testify today or

 2    remember -- recall events?

 3         A    No.

 4         Q    Would you be under -- have any type of a

 5    mental, emotional or physical condition that would

 6    impact your ability to testify?

 7         A    No.

 8         Q    Since you stopped working for -- well, can we

 9    agree that if I refer to "Stila," I'm referring to the

10    defendant in this case?

11         A    Uh-huh.

12         Q    You have to give an audible response.

13         A    Yes.

14         Q    You'll get used to that.

15              Since you stopped working for Stila, have you

16    ever been prescribed any type of medication for any type

17    of a condition other than an over-the-counter

18    medication?

19         A    No.

20         Q    Since you stopped working for Stila, have you

21    been ready, willing and able to work without restriction

22    other than, you know, a flu or a cold or something?

23         A    Yes.

24         Q    Any restrictions in any of your ability to

25    perform any work during that time period since you
```

Exhibit 10, Page 7

Daniel Medina

1    that.

2            Did you ever discuss with your partner

3    contemporaneously any of the allegations you had

4    concerning Mr. Testa?

5        A    Yes.

6        Q    And what did you tell him?

7        A    I told him how I was sexually harassed by

8    Testa and how uncomfortable it made me feel.

9        Q    As I understand your complaint, you claim that

10    the first allegations of sexual harassment by Mr. Testa

11    would have occurred in April of '22?

12        A    Yes.

13        Q    And then again the next time would have been

14    in the following year in 2023?

15        A    Yes.

16        Q    And both of those instances according to your

17    complaint, were while you were at the Ulta, U-l-t-a,

18    convention?

19        A    Yes.

20        Q    Had you had any interaction with Mr. Testa in

21    between those two events?

22        A    No, not that I'm aware of.

23        Q    Had you had any interaction with Mr. Testa

24    prior to the April 2022 event?

25        A    No.

Exhibit 10, Page 8

Daniel Medina

1      Q      He didn't interview or hire you or anything

2    like that?

3      A      No.

4      Q      Did your partner give you any advice as to

5    whether or not you should report the complaint of

6    harassment?

7      A      No.

8      Q      Did you discuss with him when you should

9    report it?

10      A      No.

11      Q      Did you -- again, contemporaneously with the

12    events prior to the lawsuit, had you had any discussions

13    with any of your family members concerning any of the

14    claims you've made in this case?

15      A      Yes.

16      Q      And who would you have discussed that with?

17      A      With my mother.

18      Q      Okay.  And did your mother give you any advice

19    as to whether or not you should report any of the

20    allegations of harassment?

21      A      No.

22      Q      Have you had any conversations since you left

23    Stila with any current or former employees concerning

24    the allegations you made in the lawsuit?

25      A      Yes.

Daniel Medina

```
 1    I don't want to know what you and your attorney
 2    discussed.
 3           But when did you first contact an attorney
 4    discussing anything concerning your work experience at
 5    Stila?
 6        A    I hired an attorney right after I was fired.
 7        Q    Few days after?
 8        A    The day after or -- yeah, it was within a
 9    couple of days as I remember.
10        Q    Okay.  You wouldn't have consulted an attorney
11    at the time when you were placed on a performance
12    improvement plan?
13        A    I was speaking to an attorney but I didn't
14    hire them.
15        Q    So when would you -- you contacted them after
16    the performance improvement plan?
17        A    No, I contacted them prior.
18        Q    And approximately when would you have
19    contacted them?
20        A    I would say it was sometime in the beginning
21    of October.
22        Q    Okay.  And who was that lawyer?
23        A    George.  I don't remember his last name.
24        Q    And then did -- who was the lawyer you
25    contacted right after you were dismissed?
```

Exhibit 10, Page 10

Daniel Medina

1        A      It was still George.

2        Q      Okay.  And so you asked her to provide a

3   statement?

4        A      Yes.

5        Q      Did she prepare the statement on her own or

6   did someone prepare it for her?

7        A      I had nothing to do with the statement, and I

8   believe she just willingly gave that information.

9        Q      So you would put her in contact with George

10   and then subsequently she would have signed a statement?

11        A      Correct.

12              MR. GUHA:  Objection.  Calls for speculation.

13              But you can answer.

14   BY MR. POPLSTEIN:

15        Q      Now, after you were dismissed, did you send a

16   general e-mail out to people with the company asking if

17   they could provide any information to support your case?

18        A      No.

19        Q      Did you indicate that you had been wrongfully

20   dismissed?

21        A      No.

22        Q      Did you make any effort to communicate with

23   any other employees by e-mail after you were dismissed?

24        A      No.

25        Q      At any time since January of 2022, have you

Exhibit 10, Page 11

Daniel Medina

1    was in attendance, have you had any type of a verbal

2    communication with him?

3         A    No.

4         Q    Any type of electronic or written

5    communication with him?

6         A    No.

7         Q    Would I be correct to understand that other

8    than the times when you and Mr. Testa may have been at

9    the 2022 Ulta conference or the 2023 Ulta conference,

10   you wouldn't have had any type of communications with

11   him or interactions with him?

12        A    No, not that I'm aware of.

13        Q    Some of this is just making sure I cover all

14   my bases.

15            Would you have at all recorded any

16   conversations between you and any Stila employee?

17        A    No.

18        Q    That would include any type of video or the

19   like on your phone or anything like that.

20        A    The only pictures or videos that I would have

21   was during an event that was required from us from Stila

22   to turn in, as they wanted pictures of events that we

23   were throwing in store.

24        Q    Do you have a LinkedIn account?

25        A    I do.

Exhibit 10, Page 12

Daniel Medina

1   Stila had produced in the case or -- which were just

2   ordinary course of business type documents?

3       A    No.

4       Q    Okay.  Did you speak with anybody besides your

5   lawyer about anything concerning your testimony or

6   events and allegations which you've asserted in this

7   case?

8       A    Yes, I spoke to Ally and I spoke to Julia.

9       Q    Was that in connection with a -- in connection

10  with preparation for the deposition or just what you've

11  testified about previously?

12      A    No, it was just in conversation that I said

13  earlier.

14      Q    Okay.  So it wasn't like once you knew the

15  deposition was being conducted, you would have spoken to

16  Ally or Julia?

17      A    No.

18      Q    Spoke to any type of therapist or counselor

19  about your deposition testimony?

20      A    No.

21      Q    When is the last time you might have seen a

22  therapist or a counselor?

23      A    I haven't.

24      Q    Okay.  So since you've been dismissed from

25  employment with Stila, you haven't -- you haven't

Daniel Medina

1    engaged or spoken to any type of a therapist or

2    counselor?

3         A    Just my primary doctor.

4         Q    And that would be -- I know we have the name

5    in the records, but what would that -- what was his

6    name?

7         A    Her name is Dr. Mata.

8         Q    That's M-a-t-a?

9         A    Yes.

10        Q    First name Francesca?

11        A    Yes.

12        Q    Does she practice on her own or does she

13   practice at a --

14        A    She's part of APLA.

15        Q    Is she a primary care physician?

16        A    For me, yes, she is.

17        Q    Okay.  Could you briefly review your

18   educational background for me?

19             You grew up in Portland, Oregon; is that

20   correct?

21        A    I was born in Idaho.

22        Q    Then how long did you live in Portland?

23        A    Six years.

24        Q    Okay.  Where did you go to high school then?

25        A    Valley View.

Daniel Medina

```
1        A     She didn't hire me.  Charles hired me, Charles
2   Miller.
3        Q     Okay.  I just want to make sure we're on the
4   same page here.
5              Mr. Miller hired you as a freelancer?
6        A     Yes.
7        Q     Okay.  So then did you receive any training
8   from Stila on their products or how to demonstrate them
9   as a freelancer?
10       A     No.  No, I didn't.  I was told makeup is
11  makeup and you should know how to sell it.  It's pretty
12  easy.  That's what Charles Miller said to me.
13       Q     Do you agree with that?
14       A     No and yes.
15       Q     How is it no?
16       A     Because there should have been some education.
17  It was the first time I had been told that from a
18  company.  But also I leveraged my experience and, you
19  know, I would figure it out.
20       Q     So then as a freelancer, then you're not
21  getting necessarily credit for the sales of the store;
22  correct?
23             Nobody is tracking if somebody sold through
24  you?
25       A     We would track ourselves and report it.
```

Exhibit 10, Page 15

Daniel Medina

1     Q    Okay.  So then how did you get hired on as an

2 employee at Stila?

3          How did that come about?

4     A    Monique quit.

5     Q    Do you know Monique's last name?

6     A    I don't.

7     Q    So Monique quit and so then what happened?

8     A    Then Charles let me know that there was an

9 opening.

10    Q    So then you applied?

11    A    Yes.

12    Q    Okay.  Did you interview with anybody besides

13 Mr. Miller?

14    A    And Nicole.

15    Q    Nicole Marr, M-a-r-r?

16    A    Yes.

17    Q    Interview with anybody else?

18    A    Not that I remember.

19    Q    Okay.  What did you understand was the

20 requirements -- responsibilities of the position?

21    A    It was typical account executive requirements

22 to my understanding where you're managing a team, you're

23 doing product sell-through, education in store, event

24 support, sales support.

25 ///

Exhibit 10, Page 16

Daniel Medina

1    employees, his attitude towards me changed.

2        Q    In general, what level of verbal -- when you

3    spoke to -- what was your general reporting procedure or

4    process with Mr. Miller?

5            Was it verbal?  Written?

6        A    We would have a conference call every Tuesday.

7        Q    That was your in-office day?

8        A    Yes.

9        Q    Would I be correct to understand that Stila

10   had an arrangement for persons who were in your position

11   that you had at least one day in the office where you're

12   not out in the field where you could do your paperwork?

13       A    Yes.

14            MR. GUHA:  Hold on.

15            THE WITNESS:  I'm sorry.

16            MR. GUHA:  Objection.  Calls for speculation.

17   But go ahead.

18            THE WITNESS:  Yes.

19   BY MR. POPLSTEIN:

20       Q    That was one of the purposes of the in-office

21   day for you to complete reports and paperwork?

22            MR. GUHA:  Same objection.

23            Go ahead.

24            THE WITNESS:  Yes.

25   ///

Daniel Medina

```
 1   BY MR. POPLSTEIN:
 2        Q     Okay.  So anyway we kind of got off track
 3   there for a second.
 4              So you would have had a verbal -- a weekly
 5   conference call with him on a Tuesday; correct?
 6        A     Yes.
 7        Q     And then were there other times when you would
 8   have communications with him verbally?
 9        A     Yes.  On Tuesdays we had a meeting with Nicole
10   Marr to go over numbers and sales, and then we would
11   break off throughout the day and have one-on-ones with
12   Charles.
13        Q     Okay.  Then besides that, on other days
14   besides Tuesday, were there -- did you have regular
15   conversations with Mr. Miller or that would be the
16   exception rather than the rule?
17        A     Every once in a while we would have to reach
18   out to Charles, and so that might have been a phone
19   call.
20        Q     What type of circumstance would prompt that?
21        A     If we had an event in a store and they weren't
22   booking appointments, I would reach out to Charles and
23   ask him, how does he want me to proceed.  If we had low
24   stock in store and we were having an event, I would
25   reach out to him and see if there was anything coming
```

```
 1              (Whereupon Defendants' Exhibit 2 was

 2              marked for identification by the Court

 3              Reporter.)

 4   BY MR. POPLSTEIN:

 5       Q      STILA 90 to 91.

 6              Do you recognize this document?

 7       A      It looks familiar.

 8       Q      Would -- in March of 2022 would have been the

 9   time you would have been employed by Stila?

10       A      Correct.

11       Q      And your position was a sales and artistry

12   executive?

13       A      Yes.

14       Q      Or, as you would say, an account executive is

15   what you refer to it?

16       A      Yes.

17       Q      And then you see the second paragraph about

18   duties and responsibilities?

19              Would that second paragraph accurately reflect

20   your duties and responsibilities as a sales and artistry

21   executive?

22       A      No, because we did a lot more outside of this.

23       Q      Okay.  What else?

24              But these would have been your duties and

25   responsibilities?
```

Daniel Medina

1    Q    And it was required by the stores that anybody

2    who's coming in from Stila or another competitor's

3    products that they have to sign in on the store log?

4    A    Yes.  But unfortunately not all the stores --

5    the stores all have binders, but during this time it's

6    high -- there's high traffic time because of the

7    seasonal because of the holidays or whatever it may be.

8         Majority of the times, the store's book that

9    you fill out would be full and there would be nowhere

10   for you to sign.  So the store would ask you, hey, can

11   you just touch base with the manager.  If we're able to

12   print off some more sheets for you to sign in to, if you

13   can just sign in.  But a lot of the stores did not even

14   have that available.

15   Q    Okay.  But I mean, the general rule is you

16   have to sign in?

17   A    Yes.

18   Q    And that was the -- that was the directive you

19   received from Nicole and Mr. Miller, that you've got to

20   sign in on the log when you get there?

21   A    Yes.

22   Q    And then you have to sign out when you leave?

23   A    Yes.

24   Q    Would that be the same procedure you would

25   have to follow with the pop-up stores?

Exhibit 10, Page 20

Daniel Medina

```
 1        A     Yes.  Every store, every single time you go
 2   into a store, you would sign in.
 3        Q     And the same with the store -- with the SGEs?
 4        A     Yes.
 5        Q     Same procedure.
 6              And when you say a store generated event, is
 7   that something then the store initiates or is that
 8   something that you initiate in conjunction with the
 9   store?
10        A     It would be a collaborate.  Yeah.  It would be
11   both of us working together in order to see how we can
12   increase business.
13        Q     Would you be required to contact the stores
14   independent of any of these types of events?
15        A     Yes.
16        Q     I mean, like, were you making essentially
17   sales calls?
18        A     No.
19        Q     No.  What type of contact would you have with
20   them?
21        A     We would have a planning meeting.
22        Q     What's involved in that?
23        A     It would be meeting with the manager and
24   setting up expectations for the event.
25        Q     Did you receive any evaluations during the
```

Exhibit 10, Page 21

Daniel Medina

1  time you were there, like formal annual evaluations?

2      A    We received -- within my first year, on my

3  one-year mark, Charles Miller asked us to basically

4  grade ourselves.  He sent us a form and told us that we

5  were going to review, and we never reviewed it.

6      Q    Okay.  So you're currently employed by Sunday

7  Riley Modern Skincare?

8      A    Yes.

9      Q    And you started on or about December 2nd

10  of 2024?

11      A    Yes.

12      Q    And what's your position there?

13      A    I'm an account coordinator.

14      Q    Handing you a document marked as Exhibit

15  No. 3, MEDINA Bates stamp 349 through 353.

16          (Whereupon Defendants' Exhibit 3 was

17          marked for identification by the Court

18          Reporter.)

19  BY MR. POPLSTEIN:

20      Q    By the way, when I say those little numbers at

21  the end, Counsel generally puts numbers on documents

22  they produce --

23      A    Okay.

24      Q    -- to show who produced it and give page

25  numbers.  So those aren't ordinarily -- they aren't part

Daniel Medina

1      Q      You haven't been taking any kind of ongoing

2   prescription medication other than for the ADHD?

3      A      And allergies.

4      Q      And allergies.  Have -- since you started

5   working for Stila -- well, I'll start a different way.

6            Since your employment with Stila ended, had

7   there -- have there been any changes in kind of the way

8   of your normal life activities?

9            MR. GUHA:  Objection.  Vague.  Calls for

10  expert opinion.

11           Go ahead.

12           THE WITNESS:  Yeah.  I had to look for work

13  after being released from them.

14  BY MR. POPLSTEIN:

15     Q      Sure.  Did you experience any loss of interest

16  in any hobbies that you were normally -- that you like

17  to do?

18     A      At the time, no.  At the time because I was

19  looking for work.

20     Q      Okay.  Was there any just change in what you

21  were doing in terms of entertainment or going out?

22     A      I don't really go out and -- yeah.  No.

23     Q      I'm really just looking to see whether there

24  were any changes in the habits you normally do outside

25  of work in terms of what you were doing on a day-to-day

Exhibit 10, Page 23

Daniel Medina

```
1          Q    Okay.  And she encouraged you to apply?

2          A    She just let me know that the job was

3     available.

4          Q    Was -- let me hand you a document I marked as

5     Exhibit No. 6, STILA 114 through 116.

6               (Whereupon Defendants' Exhibit 6 was

7               marked for identification by the Court

8               Reporter.)

9               MR. POPLSTEIN:  That's for him.

10              MR. GUHA:  Oh, right.

11    BY MR. POPLSTEIN:

12         Q    Document entitled "Stila Styles, LLC Policy

13    Against Harassment-CA."

14              Does it show on page 2 that you would

15    have -- you would have signed for this document at least

16    perhaps through DocuSign?

17         A    Looks like that.

18         Q    Okay.  Do you recall seeing this document

19    before?

20         A    Vaguely.

21         Q    This is not the first policy against

22    harassment you've probably ever reviewed in your tenure;

23    correct?

24         A    Right.

25         Q    Had you received prior training on sexual
```

Daniel Medina

```
 1   harassment before you started with Stila?
 2        A    The only sexual harassment was actually
 3   through All Works when I was freelance, and it was
 4   required.
 5        Q    Okay.  This policy would indicate that if you
 6   felt you were a victim of sexual harassment, you should
 7   follow the complaint procedure.
 8        A    What was your question?  I'm sorry.
 9        Q    Did you understand that if you felt that you
10   were a victim of sexual harassment under this policy
11   that you should follow the complaint procedure?
12        A    I was unaware of the complaint procedure.  I
13   was just told that it should be shared with a manager.
14        Q    Well, I mean, can we agree that at least this
15   document here indicates what the complaint procedure is?
16        A    Oh, yes.  But also Stila never had a human
17   resources officer, so I don't know who I would have
18   reported that to.
19        Q    This says, "If you feel that another employee
20   has harassed you, you should immediately notify your
21   supervisor or manager.  If you feel the matter could not
22   be discussed with the human resources, you should
23   contact human resources or another member of management
24   to discuss your complaint"; correct?
25        A    Yes.
```

Exhibit 10, Page 25

Daniel Medina

1      Q      So the policy does actually tell you what to

2    do in case -- if there was an instance of sexual

3    harassment, as well as telling you in another page here

4    that you can contact the California Department Of Fair

5    Employment And Housing.

6              Would you also understand that under this

7    policy that if you become aware of a violation of this

8    policy that you should -- you should report it?

9      A      Yes.

10             MR. GUHA:  That calls for a legal conclusion.

11             You can answer.

12             THE WITNESS:  Yes.

13   BY MR. POPLSTEIN:

14     Q      Okay.  And then I'm going to hand you a

15   document which is marked as Exhibit 7, STILA 189.

16             (Whereupon Defendants' Exhibit 10 was

17             marked for identification by the Court

18             Reporter.)

19   BY MR. POPLSTEIN:

20     Q      This indicates that it was -- it says

21   "Certificate Of Training Of Completion Of Sexual

22   Harassment Awareness Training For Nonsupervisory

23   Employees."

24             Did you -- you recall going through that

25   training program?

Exhibit 10, Page 26

Daniel Medina

 1       A    This was when I was working as a freelancer.
 2   I was not an employee of Stila.
 3       Q    Well, actually this is dated June 9 of 2022.
 4       A    Yeah.  I don't remember that then.
 5       Q    Okay.  Because the offer letter you signed was
 6   dated March of 2022.
 7       A    Okay.
 8       Q    So you would have been a Stila employee at
 9   this time then; correct?
10       A    Okay.
11       Q    So you do recall going to training for this?
12       A    I don't remember.
13       Q    Okay.  But you're not doubting that the
14   certificate issued showed you completed training; right?
15       A    Yes.
16       Q    Okay.  I've got a couple of these documents I
17   just want to get through here at the same time.
18            Handing a document marked Exhibit 7, Stila 24
19   through 25.  Okay.
20            Correct the record.  The training certificate
21   of completion was Exhibit 10.
22            (Whereupon Defendants' Exhibit 7 was
23            marked for identification by the Court
24            Reporter.)
25            MR. GUHA:  I see.  So 10.  All right.  Then

Daniel Medina

1    this one is?

2              MR. POPLSTEIN:  That one is still 7.

3              MR. GUHA:  Does Exhibit 7 then include the

4    previous harassment then also?

5              MR. POPLSTEIN:  That should have been

6    Exhibit 6.

7              MR. GUHA:  Got it.  Okay.  Thank you.

8    BY MR. POPLSTEIN:

9        Q    Again this shows -- well, do you recall

10   receiving this sexual harassment policy?

11       A    No, I don't remember this.

12       Q    Okay.  Let me -- do you recall receiving an

13   employee handbook when you started working for Stila?

14       A    I believe it was a Word document.

15       Q    I'm handing you a document marked Exhibit 8,

16   STILA 82.

17              (Whereupon Defendants' Exhibit 8 was

18              marked for identification by the Court

19              Reporter.)

20   BY MR. POPLSTEIN:

21       Q    Would that indicate -- would that be a

22   document reflecting a handbook acknowledgment?

23       A    Yes.

24       Q    And this would have indicated that you would

25   have received a copy of the handbook and reviewed it?

Daniel Medina

1           A      Yes.

2           Q      Okay.  Thank you.  I'm handing you a document

3      marked Exhibit 9.

4                  (Whereupon Defendants' Exhibit 9 was

5                  marked for identification by the Court

6                  Reporter.)

7      BY MR. POPLSTEIN:

8           Q      Obviously you wouldn't have received this

9      document -- you would have received this in Word form

10     electronically; would that be correct?  Or at least the

11     handbook electronically?

12          A      Yes.

13          Q      If this was a -- if the evidence would show

14     that this was a handbook that was in place at the time

15     you would have signed the acknowledgment, would you have

16     any reason to disagree with that?

17          A      Yes.

18          Q      Now I'm going to take a step back for a minute

19     on reporting.

20                 When you had the incident with -- at Tom Ford,

21     did you report that harassment to anyone?

22                 MR. GUHA:  Objection.  Calls for a legal

23     conclusion.

24                 Go ahead.

25                 THE WITNESS:  I don't remember.  I was asked

Daniel Medina

```
 1   to come into the case, not -- I didn't provoke that.
 2   BY MR. POPLSTEIN:
 3        Q    Okay.  Well, had you ever been subjected to
 4   any type of conduct that you considered to be a
 5   violation of a sexual harassment policy prior to the
 6   time you worked for Stila independent of whatever
 7   happened at Tom Ford?
 8             MR. GUHA:  Calls for a legal conclusion.
 9             You can answer.
10             THE WITNESS:  Can you rephrase it or say it
11   again?  I didn't hear you.
12             MR. POPLSTEIN:  Why don't you repeat the
13   question?
14             (The record was read.)
15             THE WITNESS:  No.
16   BY MR. POPLSTEIN:
17        Q    Looking at the document which is Exhibit 9,
18   can you turn to page 16?
19             Okay.  So I would assume, if this was the Word
20   document that was provided to you as the policy in 2022,
21   you would have read it or at least reviewed it?
22             MR. GUHA:  Are you asking if he, in fact,
23   reviewed it?
24             MR. POPLSTEIN:  I'm asking if he reviewed it.
25             MR. GUHA:  Yeah.  No objection.
```

Daniel Medina

```
 1                THE WITNESS:  I skimmed over it.
 2   BY MR. POPLSTEIN:
 3        Q      Turning your attention to page 17, do you see
 4   the paragraph on duty to report violations of this
 5   policy?
 6                It indicates, "Employees who are subjected to
 7   sexual harassment, unlawful harassment or abusive
 8   conduct, or those who observe harassment or abusive
 9   behavior by or towards another employee are required to
10   immediately report the facts of the incident to their
11   immediate supervisor or to human resources."
12                Do you see that?
13        A      Yes, I do see it.
14        Q      Okay.  Did you understand then that as an
15   employee of Stila you had that duty to report
16   violations?
17                MR. GUHA:  Objection.  Calls for a legal
18   conclusion.
19                Go ahead.
20                THE WITNESS:  Yes.
21   BY MR. POPLSTEIN:
22        Q      Now -- so I guess my one question is when you
23   thought that Mr. Testa was harassing you back in April
24   of 2022, why didn't you report it at that time?
25                MR. GUHA:  Objection.  Mischaracterization.
```

Exhibit 10, Page 31

```
 1        A    No.

 2        Q    In fact, she made sure that you got paid

 3   whatever you were owed, including the backpay; right?

 4             MR. GUHA:  Objection.  Calls for speculation.

 5   Calls for a legal conclusion.

 6             Go ahead.

 7             THE WITNESS:  I received money.  I don't know

 8   if it was everything that was owed.

 9   BY MR. POPLSTEIN:

10        Q    Well, do you have any reason to believe --

11   well, I'll strike that question.

12             Are you claiming today in your lawsuit that

13   she wasn't -- that you weren't paid everything that you

14   were owed for the backpay relating to the wages that

15   would have been paid to you for the exempt status?

16             MR. GUHA:  Calls for a legal conclusion.

17             Go ahead.

18             THE WITNESS:  I don't know.

19   BY MR. POPLSTEIN:

20        Q    Handing a document marked as Exhibit 15, STILA

21   209-210.

22             (Whereupon Defendants' Exhibit 15 was

23             marked for identification by the Court

24             Reporter.)

25   ///
```

Daniel Medina

```
1   BY MR. POPLSTEIN:
2        Q    Do you recall receiving this e-mail chain on
3   or about the dates indicated?
4        A    Yes.
5        Q    And then you did thank her for fixing this?
6        A    Yes.
7        Q    So at least at this point you felt like she
8   had -- you had gotten paid for whatever you thought you
9   were owed?
10            MR. GUHA:   Objection.   No.   You can answer
11  actually.   No objection.
12            THE WITNESS:   At this point, yes.
13  BY MR. POPLSTEIN:
14       Q    Exhibit 16, MEDINA 110.
15            (Whereupon Defendants' Exhibit 16 was
16            marked for identification by the Court
17            Reporter.)
18  BY MR. POPLSTEIN:
19       Q    I think the only pertinent part of this
20  document is -- would be that top e-mail exchange.
21            That was to Karen?
22       A    Yes.
23       Q    And I guess again at some point in time a
24  subsequent payment was made?
25       A    I received a payment.
```

1    in and visited in store, I was -- I left Sherman Oaks

2    was one of the incidents, and I was setting up a

3    corporate event in Canoga Park.  It was great practice

4    as an executive to leave a store in support, especially

5    since there was already two other artists that were

6    scheduled for that day.

7             Our job was to set up the day prior, the

8    evening prior, if we could, and sometimes those setups

9    would take three to four to five hours depending on how

10   big the event was.

11        Q    In your experience with Julia, the freelancer,

12   you had worked with her on a number of occasions;

13   correct?

14        A    Yes.

15        Q    Did you always find her to be truthful?

16        A    Yes.

17        Q    And how about Tori, the other freelancer, you

18   worked with her on a regular basis?

19        A    Not on a regular basis.

20        Q    But a number of times?

21        A    It was -- Tori was only with the company a

22   month or two.

23        Q    Okay.  Did you ever find her to be untruthful?

24        A    No.  I have no reason to believe that.

25        Q    Handing you a document marked Exhibit 21,

Daniel Medina

```
 1    MEDINA 70.

 2              (Whereupon Defendants' Exhibit 21 was

 3              marked for identification by the Court

 4              Reporter.)

 5    BY MR. POPLSTEIN:

 6         Q    Do you recall being privy to this e-mail

 7    exchange here from November of 2023?

 8         A    Yes.

 9         Q    Okay.  And this is an e-mail that was sent

10    after you were on a performance improvement plan;

11    correct?

12         A    Yes.

13         Q    And did you understand from Ms. Marr's e-mail

14    here that it was -- it is nonnegotiable for all Stila

15    employees to sign into the vendor log, and if none was

16    available, they were to share at the time of arrival

17    that there was no log available?

18         A    What was the question?

19         Q    Did you understand that was the -- what

20    Ms. Marr's requirements were?

21         A    Yes.  But if I went into a store and the

22    vendor log was not available but I'm told by a store

23    that they're going to create more sheets so that we can

24    log in and it never happens, then there was nothing much

25    I could do.
```

Exhibit 10, Page 35

Daniel Medina

1    referring to that I don't understand what that is.

2        Q    Okay.  Well, let's look at the next page, 203

3    at the bottom.  That's sent on October 19th, on

4    Thursday, and then that evening you send him back a

5    letter saying, "I know I've been distracted with mom in

6    and out of the hospital as this is not my usual

7    performance, as I consistently have goal-making events

8    and comps and LYS numbers.  Thank you for your patience

9    and understanding during this difficult time for my

10   family.  I will do better."

11           Do you see that?

12       A    Yes, I do.

13       Q    Okay.  So are you saying here that you

14   recognize you weren't providing the reports that

15   Mr. Miller had requested?

16       A    No.  I was providing the reports.

17   Unfortunately, Charles would change what the reports

18   look like, what he needed as in sales, numbers, or he

19   would come up with what was the total expense that

20   you're spending per store or what is the total number

21   you're spending per freelancer.

22           Like I said, the expectation changed every

23   single day just like his mood.

24       Q    So when you say, "This is not my usual

25   performance," what do you think would have been your

Daniel Medina

1    A    Yes.

2    Q    Okay.  Then was there an occasion where --

3    this is where -- for the Cerritos location was where

4    there was an issue about personal sales by you of $600?

5    A    It wasn't personal sales.  It was our overall

6    sales for the day for a pop-up event as well.

7    Q    This was where you were not at the store when

8    Nicole signed and you hadn't signed the log?

9    A    I'm sorry.  What was the question?

10    Q    Was there an occasion at the Cerritos location

11    where Nicole had called and you had not signed into the

12    log but Julia and Ally were in the store?

13    A    Yes.  That was the day of the emergency with

14    Tori.

15    Q    With the freelancer having --

16    A    The emergency, the diagnosis, yes.

17    Q    And you didn't tell -- you didn't say you were

18    at the store at that time?

19    You didn't say that you were at the store that

20    day?

21    MR. GUHA:  Vague.  Go ahead.

22    THE WITNESS:  To who?

23    BY MR. POPLSTEIN:

24    Q    To Nicole.

25    A    Nicole didn't reach out to me until after --

Exhibit 10, Page 37

Daniel Medina

1    specific time for vendors?

2         A    I don't understand the question.

3         Q    Ulta had a policy that all vendors who

4    reported to a store had to sign the vendor log, and was

5    it also Ulta policy that the vendor had to sign in with

6    the specific time they signed in and also sign in with

7    the specific time they signed out?

8         A    It was the -- what Ulta does is it's going to

9    be your shift, your time in and time out.  So people

10   know that they're going to be working 12:00 to 2:00 or

11   whatever shift that would be, they would put that on

12   there.

13        Q    Now, we talked a little bit before about the

14   Cerritos location and that in particular on that one day

15   you had two freelancers working there but it was a slow

16   day.

17        A    Yes.  I had two people working there.

18        Q    And that was, in part, slow because the

19   weather was bad?

20        A    I don't remember why it was a slow day.  I

21   know we scheduled ourselves a pop-up event, and so

22   that's why I had two artists plus myself for that day.

23        Q    Okay.  So you are also there the whole day?

24        A    I wasn't there the whole day.  I was there in

25   the morning.  I dropped off the collaterals so they can

Exhibit 10, Page 38

Daniel Medina

```
 1              MR. GUHA:  Same objection.
 2    BY MR. POPLSTEIN:
 3         Q    So what's the basis for the $55,000?
 4              MR. GUHA:  Same objection.  Asked and
 5    answered.
 6              THE WITNESS:  Yeah, I didn't write this and I
 7    didn't calculate it, so I don't know how that number was
 8    found.
 9    BY MR. POPLSTEIN:
10         Q    Are you still claiming that from the date you
11    signed these interrogatories that you will be continuing
12    to suffer future economic damages?
13              MR. GUHA:  Same objections.
14              THE WITNESS:  Hopefully not.
15    BY MR. POPLSTEIN:
16         Q    You're making more now than what you made when
17    you were at Stila?
18         A    Yes.
19         Q    Benefits are similar?
20         A    I'm not sure.  I haven't compared them in that
21    manner.
22         Q    Same amount of paid time off or more paid time
23    off?
24         A    I want to say it's similar.
25         Q    So can you identify any money you're losing by
```

```
 1   STATE OF CALIFORNIA        )
                                )  SS.
 2   COUNTY OF LOS ANGELES

 3

 4         I, LEESA DURRANT, C.S.R. NO. 11899, RPR, in and

 5   for the State of California, do hereby certify:

 6         That prior to being examined, the witness named

 7   in the foregoing deposition was by me duly sworn to

 8   testify to the truth, the whole truth, and nothing but

 9   the truth;

10         That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter transcribed under my direction, and the same

13   is a true, correct, and complete transcript of said

14   proceedings;

15         That if the foregoing pertains to the original

16   transcript of a deposition in a Federal Case, before

17   completion of the proceedings, review of the transcript

18   (  ) was (  ) was not required.

19         I further certify that I am not interested in

20   the event of the action.

21         Witness my hand this 9th day of June, 2025.

22
                         Leesa Durrant
23
              LEESA DURRANT, C.S.R. NO. 11899, RPR
24

25
```